2010 Ark. App. 787

**Ralph HALL et al., Appellants**

v.

**CITY OF BRYANT, Arkansas et al., Appellees.**

**No. CA 10–25.**

Court of Appeals of Arkansas.

Dec. 1, 2010.

Richard Hartley Mays, Mays & White, PLLC, Heber Springs, for appellant.

Nga C. Ostoja-Starzewski, Bryant, Michael Allen Mosley, North Little Rock, for appellee.

LARRY D. VAUGHT, Chief Judge.

The fourteen appellants[1] sued the City of Bryant, its mayor, and its director of public works (collectively, the City) for declaratory and injunctive relief, alleging that the City violated several state and federal regulations governing floodplain management in the construction of a park near their homes. The Saline County Circuit Court granted summary judgment to the City and dismissed appellants' complaint with prejudice. We find that there is an issue of material fact, reverse the trial court's grant of summary judgment, and remand for further proceedings.

Appellants own and reside on properties located along Lea Circle in Bryant, Arkansas. All or a portion of their properties are located in the floodplain[2] of Hurricane Creek, and most of their properties are covered by flood insurance under the National Floodplain Insurance Program provided by the United States government. In late 2007, the City acquired approximately 106 acres located along the west bank of Hurricane Creek. It is undisputed that virtually all of the 106–acre tract is located in a 100–year floodplain and approximately half of the park property lies in the creek's floodway.[3]

In January 2008, the City began construction of a park and sports complex on the property in question. Early on, appel-

---

1. The appellants are Ralph Hall, Ann Hall, Joe Caple, Sandra Caple, John Morgan, Mesha Morgan, John Kettles, Sherrie Kettles, Charles Tabor, Rebecca Tabor, Andrew Calhoun, Shannon Calhoun, Dana Byrd, and Linda Zehner.

2. A floodplain is "any land area susceptible to being inundated by water from any source." 44 C.F.R. § 59.1 (2009).

3. A floodway is "the channel of a river or other water course and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height." 44 C.F.R. § 59.1.

lant Ralph Hall feared that the construction of the park might have a negative impact on the area's natural propensity to flood. He registered his complaints with Richard Penn, the City's Floodplain Administrator. As a result of Hall's efforts, the City agreed to make alterations to a soccer field that abutted the creek. Not completely satisfied, Hall also complained to Michael Borengasser, the National Flood Insurance Program Coordinator of the Arkansas Natural Resources Commission. In March 2008, after inspecting the construction site, Borengasser went to Penn's office to inform him that a substantial portion of the development was within the creek's floodway. In a letter confirming their meeting, Borengasser further advised Penn that:

According to regulations which should be in either ordinance or code for the City of Bryant an[ ] engineering review of the project site is required to demonstrate a "no rise" from development in the floodway and that the carrying capacity of streams throughout the base flood plain is maintained.

It is recommended that before development proceeds a conditional letter of map revision (CLOMR)[4] is submitted to FEMA [Federal Emergency Management Agency]. This will assure that if the development is constructed as proposed, the development will be compliant with the City ordinance and NFIP [National Flood Insurance Program] criteria. If the development will result in either an increase in the BFE [base flood elevation], ... or an increase in the floodway boundary, a CLOMR is required. If the development either re-

sults in no change or a reduction in the three dimensions above, a CLOMR, while recommended, is not required. In any event a LOMR [letter of map revision][5] is required upon completion of the project.

Following Borengasser's visit, Penn halted construction of the park project and directed the engineering company hired by the City for the project, ETC Engineers & Architects, Inc., to submit a hydrologic study. On April 16, 2008, Shawkat Ali, Ph.D., an ETC engineer, issued a report stating that the City's construction would not increase the base-flood-elevation levels but would instead decrease them. That same month, four-to-five-inch rains flooded appellants' properties. While the appellants averred that their property had flooded in the past, they contended that this flooding was worse than previous floods.

To review Ali's report, Hall hired Thomas Black, an engineer and certified floodplain manager. In his report and subsequent deposition, Black opined that Ali failed to follow accepted "standard engineering practice" in performing his analyses. Specifically, Black stated that Ali did not use the 1979 Flood Insurance Study (FIS) model required by FEMA; that Ali used a starting water surface elevation for the BFE that was .54 feet higher than that calculated in the 1979 FIS; that Ali changed the "n" values;[6] and that Ali "interpolated" (artificially created) cross-sections that were not in the original model. Black added that Ali did not conduct any floodway analyses, which were necessary to prove that the project was

4. A CLOMR is a pre-project application to FEMA showing what changes the proposed project will make to the local floodplain.

5. A LOMR is a letter submitted to FEMA upon completion of a project showing the changes actually made.

6. Black testified that the "n" value is a floodplain friction factor that represents the resistance of the terrain to water moving across it.

compliant with the City's floodplain regulations. Black also stated that the results of Ali's study showed that the floodway boundaries were shifted east over property that was outside the data depicted on the floodway map. This required the City to submit a CLOMR and obtain its approval from FEMA. To Black's knowledge, a CLOMR was not prepared. Finally, Black contended that the City's study should have been performed before construction began.

Ali prepared another report, dated October 14, 2008, that considered Black's criticisms of the April 2008 report. Ali's revised report concluded that there would be no increase in base flood elevation as a result of the park project. In his report and his subsequent deposition, Ali insisted that CLOMR was not necessary but that a LOMR might be necessary at the completion of the project.

Also on October 14, 2008, Roy McClure, the National Hazards Program Specialist with FEMA, wrote a letter to the mayor of the City about the City's construction in the floodway. McClure stated that prior to the start of construction, it must be shown that the development will not cause an increase in the base flood elevation within the community and that the completion of this requirement is referred to as a "No–Rise Certificate," which must be completed by a professional engineer. McClure, who was aware of Ali's' April 2008 report and referred to it as a "belated No–Rise certificate," stated that Ali's report had been reviewed by another engineer (Black) who identified areas for improvement in the engineering analysis. McClure wrote:

> As the entity responsible for identification and publication of flood risk data, FEMA has established the Conditional Letter of Map Revision (CLOMR) process for review of engineering data. With this correspondence, I am asking that the City of Bryant promptly submit the Hurricane Creek floodway alteration project design to FEMA for a CLOMR review which will establish conformity with the engineering standards used for the generation of Flood Insurance Rate Maps (FIRM).... Typically, CLOMRs are requested before the physical aspects of a project begin in an effort to assure either, that the BFE will not be increased, or that the as-built project will not need retroactive alteration to be brought into compliance with the local floodplain management ordinance and NFIP standards. This process also helps prevent undue flood losses for residents of the watershed.

Black reviewed Ali's revised report and found that it was not a proper analysis of whether the park project would increase the base flood elevation along the creek. He also reported that there were discrepancies in Ali's analysis, which he asserted were not credible, when compared with the data Ali was required to use. He repeated his assertion that a CLOMR was required to be performed and reviewed by FEMA.

On December 10, 2008, appellants filed their complaint seeking declaratory and injunctive relief.[7] The complaint alleged that as a result of the City's failure to follow federal and state law, as well as certain city ordinances, the City created a private nuisance, a public nuisance, and trespass. On June 26, 2009, the City filed for summary judgment, arguing that the studies conducted by Ali substantially complied with the requirements of the ordi-

---

**7.** Appellants originally filed suit in federal court on April 2, 2008, against the City and several federal defendants. The federal defendants were granted summary judgment, and the claims against the City were dismissed without prejudice on December 1, 2008.

nance and federal regulations because the studies showed no increase in the base flood elevation, which obviated the need for a CLOMR review or any further studies. The City asserted that it was incumbent on appellants to meet proof with proof by producing a study showing that the levels would be increased. The City also maintained that the appellants failed to present proof of damages or harm as a result of the park project or flooding in April 2008.

In opposition to the motion for summary judgment, appellants argued that they were not required to meet proof with proof by producing a study to contradict Ali's conclusion that the base flood elevation did not increase. Instead, appellants argued that summary judgment was improper because they presented sufficient proof that Ali's reports were not performed in accordance with standard engineering practice, which supported their position that the City failed to comply with its ordinances and state law.

By order entered on September 16, 2009, the court granted the City's motion for summary judgment, finding only that appellants had "failed to demonstrate the likelihood that they will sustain damages or that there is a question of fact on the issue of damages, a necessary element of their claims." The trial court made no findings on the issue of whether the City complied with its ordinances or state/federal law. This appeal followed.

Our supreme court has set forth the following standard of review with regard to motions for summary judgment:

Our standard of review for summary judgment cases is well established. Summary judgment should only be granted when it is clear that there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. The purpose of summary judgment is not to try the issues, but to determine whether there are any issues to be tried. We no longer refer to summary judgment as a drastic remedy and now simply regard it as one of the tools in a trial court's efficiency arsenal. Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. We view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. Moreover, if a moving party fails to offer proof on a controverted issue, summary judgment is not appropriate, regardless of whether the nonmoving party presents the court with any countervailing evidence.

*Harvest Rice, Inc. v. Fritz & Mertice Lehman Elevator & Dryer, Inc.*, 365 Ark. 573, 575–76, 231 S.W.3d 720, 723 (2006) (citations omitted). The standard is whether the evidence is sufficient to raise a fact issue, not whether the evidence is sufficient to compel a conclusion. *Wagner v. General Motors Corp.*, 370 Ark. 268, 258 S.W.3d 749 (2007). A fact issue exists, even if the facts are not in dispute, if the facts may result in differing conclusions as to whether the moving party is entitled to judgment as a matter of law. *Wagner*, 370 Ark. at 271, 258 S.W.3d at 753. In such an instance, summary judgment is inappropriate. *Id.*, 258 S.W.3d at 753.

The statutes on flood-loss prevention, contained in Arkansas Code Annotated

sections 14–268–101 et seq., were enacted in 1969 following the passage of the National Flood Insurance Act administered by FEMA. The statutes provide communities in Arkansas with the authority to take appropriate actions to prevent and lessen flood hazards and losses. *City of Dover v. City of Russellville,* 363 Ark. 458, 462, 215 S.W.3d 623, 626 (2005) (citing *Hurst v. Holland,* 347 Ark. |₈235, 61 S.W.3d 180 (2001); Ark.Code Ann. § 14–268–101(5) (Repl.1998)). At issue is section 14–268–105 (Repl.1998), which provides:

> Every structure, building, fill, or development placed or maintained within any flood-prone area[8] in violation of measures enacted under the authority of this chapter is a public nuisance. The creation of any of these may be enjoined and the maintenance thereof may be abated by action or suit of any city, town, or county, the state, or any citizen of this state.

Arkansas Code Annotated section 14–268–104 grants cities the authority to enact ordinances controlling the management and use of land in flood-prone areas. By this grant of authority, the City enacted Ordinance 95–31, Article 5, Section E, which provides:

> Floodways—located within areas of special flood hazard ... are areas ... designated as floodways. Since the floodway is an extremely hazardous area due to the velocity of flood waters which carry debris, potential projectiles and erosion potential, the following provisions shall apply:
>
> (1) Encroachments are prohibited, including fill, new construction, substantial improvements and other development within the adopted regulatory floodway *unless* it has been demonstrated through hydrologic and hydraulic analy-

ses performed in accordance with standard engineering practice that the proposed encroachment would not result in any increase in flood levels within the community during the occurrence of the base flood discharge. (Emphasis in original.)

■ Relying upon Ordinance 95–31 and Arkansas Code Annotated section 14–268–105, appellants argue that the trial court erred in granting summary judgment because there is a genuine issue of material fact as to whether the City's park project, constructed in a floodplain, is a nuisance as a matter of law, entitling them to injunctive relief. More specifically, appellants argue that section 14–268–105(a) makes compliance with its provisions contingent upon |₉compliance with Ordinance 95–31, which provides that hydrologic and hydraulic analyses be "performed in accordance with standard engineering practice." Whether the City performed these analyses in accordance with standard engineering practice, according to appellants, is a hotly disputed issue. We agree.

Appellants presented facts that the City did not provide any type of hydrologic and hydraulic analyses prior to initiating the new construction of the park project as required by Ordinance 95–31. (The project began in January 2008, and Ali's first report was not generated until April 2008.) Further, Black's reports, deposition, and affidavit provided an abundant amount of evidence that Ali's reports were not prepared in accordance with standard engineering practice. McClure, the National Hazards Program Specialist with FEMA, acknowledged in his letter to the mayor of the City that Ali's report had been called into question by another engineer.

Furthermore, the facts are undisputed that at the time the construction project

8. A flood-prone area, like a floodplain, is "any land area susceptible to being inundated by water from any source." 44 C.F.R. § 59.1.

began, the City had not conducted any studies on the effect the project would cause on the floodplain; therefore, no pre-project CLOMR was filed. However, there was conflicting evidence as to whether the City was required to submit a CLOMR. The City maintained that it was not required to file a CLOMR. To the contrary, Black testified that the City was required to submit a CLOMR and that the City did not submit one. Independent witnesses, Borengasser and McClure, separately recommended that the City submit a CLOMR or other documentation showing that the development would not cause an increase in the base flood elevation within the community. All of this evidence creates a fact question on the issue of whether the City complied with Ordinance 95–31 and section 14–268–105.

We reject the City's contention that the facts are undisputed that it substantially complied with its ordinances. We first note that Ordinance 95–31 requires more than substantial compliance. Article 3, Section D, of Ordinance 95–31 provides that "[n]o structure or land shall hereafter be located, altered, or have its use changed without *full* compliance with the terms of this ordinance and other applicable regulations." (Emphasis added.) Nevertheless, the evidence cited above demonstrates a factual dispute on this issue.

We also find no merit in the City's alternative argument that the trial court properly granted summary judgment because the appellants failed to meet proof with proof on the issue of whether they will or had sustain(ed) damages because of the construction of the park project. We acknowledge the testimony of appellants' expert, Black, that he had "no idea" if the project would raise the elevation levels because the City failed to conduct a proper hydrologic analysis and that he did no testing to confirm the levels. However,

based on the plain language of section 14–268–105 and our supreme court's holding in *City of Dover v. City of Russellville*, 363 Ark. 458, 215 S.W.3d 623 (2005), appellants' lack of proof of damages is not dispositive to their claim for injunctive relief based on nuisance.

The plain language of section 14–268–105 provides that a structure is a nuisance as a matter of law if it is placed or maintained in a flood-prone area in violation of an ordinance enacted under sections 14–268–101 et seq. Ark.Code Ann. § 14–268–105. Furthermore, pursuant to this statute, the nuisance can be enjoined by a citizen of this State. *Id.* This statute does not require that the citizen present proof of damages or irreparable harm in order to obtain injunctive relief. *Id.*

In the instant case, it is undisputed that the City's project was constructed in a flood-prone area. Whether the City complied with Ordinance 95–31 is in dispute. If appellants are able to meet their burden on that issue, then the project would be a nuisance as a matter of law, subject to an injunction. Appellants would not be required to prove damages or harm. Ark. Code Ann. § 14–268–105.

Our supreme court's holding in *City of Dover* provides further support for our conclusion that appellants are not required to present proof of damages in order to obtain injunctive relief under section 14–268–105. In *City of Dover*, the supreme court affirmed the trial court's grant of a permanent injunction to Russellville, holding that Dover's construction of a sewage treatment plant in a flood-prone area that was subject to Russellville's land-use ordinances constituted a public nuisance as a matter of law pursuant to Arkansas Code Annotated section 14–268–105. In that case, Russellville's land-use ordinance prohibited construction in areas prone to flooding, and it was found that the area where Dover sought to build the sewage

plant was flood-prone. *City of Dover*, 363 Ark. at 461, 215 S.W.3d at 626. Based on those two facts, and without any discussion of whether Russellville would suffer damages as a result of the construction of the sewage plant, the supreme court (relying upon section 14–268–105) held that Dover's plant was a nuisance as a matter of law and affirmed the injunction. *Id.* at 461–62, 215 S.W.3d at 626.

In sum, we hold that there is an issue of material fact to be determined regarding whether the City fully complied with standard engineering practice as required by Ordinance 95–31. Without such a finding, it cannot be determined whether the park project is a nuisance as a matter of law pursuant to Arkansas Code Annotated section 14–268–105. Appellants need not prove damages as the trial court required it to do. As such, the trial court's grant of summary judgment in favor of the City was inappropriate; therefore, we reverse the trial court's order and remand the case for further proceedings.

Reversed and remanded.

GLADWIN and HENRY, JJ., agree.